No. 09-40394


IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JUAN ANTONIO ORTIZ,
Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Texas
_____

BRIEF FOR APPELLANT
_____

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

LAURA FLETCHER LEAVITT
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas   77002-1634
        Telephone:  (713) 718-4600

## CERTIFICATE OF INTERESTED PERSONS
## United States v. Juan Antonio Ortiz,
## No. 09-40394

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

1.  The Honorable Hilda G. Tagle, United States District Judge.

2.  Mr. Juan Antonio Ortiz, Defendant-Appellant.

3.  United States of America, Plaintiff-Appellee.

4.  Counsel for Plaintiff-Appellee:
    United States Attorney Tim Johnson; and Assistant United States Attorney Angel Castro (trial counsel).

5.  Counsel for Defendant-Appellant:
    Federal Public Defender Marjorie A. Meyers; and Assistant Federal Public Defenders Paul Hajjar (trial counsel) and Laura Fletcher Leavitt (appellate counsel).

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.


_____
LAURA FLETCHER LEAVITT

<u>REQUEST FOR ORAL ARGUMENT</u>

The defendant-appellant, Juan Antonio Ortiz, requests oral argument.  The first two preserved issues address whether the district court clearly erred in determining the base offense level.  Because these issues are fact-intensive ones, oral argument would benefit the Court.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    ISSUE ONE RESTATED:  The district court reversibly erred when it found, under the "relevant conduct" provision of USSG § 1B1.3, that Mr. Ortiz was responsible for the cocaine found in another person's suitcase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    ISSUE TWO RESTATED: The district court committed reversible error by calculating Mr. Ortiz's base offense level under the Guidelines on the basis of the gross weight of the marijuana involved in his offense, rather than the net weight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ISSUE THREE RESTATED:   At a minimum, this case should be remanded for correction of the statement of reasons attached to the judgment, pursuant to Fed. R. Crim. P. 36, because the present statement of reasons incorrectly reflects that the 120-month prison sentence imposed is the mandatory minimum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF CITATIONS

Page

## CASES

Anderson v. City of Bessemer City, 470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . 13

Chukwurah v. United States, 813 F. Supp. 161
 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Angeles-Amaya, 9 Fed. Appx. 640
 (9th Cir. 2001) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Arviso-Mata, 442 F.3d 382
 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Bobbitt, Cr. No. C-06-282 & C.A. No. C-07-393,
 2008 WL 822025 (S.D. Tex. Mar. 26, 2008) . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Booker, 334 F.3d 406
 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Clonts, 966 F.2d 1366
 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Delgado-Martinez, 564 F.3d 750
 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

United States v. Johnson, 588 F.2d 961
 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Judon, 581 F.2d 553
 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Leal, 74 F.3d 600
 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CASES - (Cont'd)

United States v. Lopez-Alvarez, 253 Fed. Appx. 404
  (5th Cir. 2007) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Luster, 896 F.2d 1122
  (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Martinez, 496 F.3d 387
  (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

United States v. Mitchell, 964 F.2d 454
  (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Montoya, 952 F.2d 226
  (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Neal, 578 F.3d 270
  (5th Cir.  2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 39

United States v. Paul, 274 F.3d 155
  (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Sapp, 439 F.2d 817
  (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. United States Gypsum Co., 333 U.S. 364 (1948) . . . . . . . . . . . 13

United States v. Wall, 180 F.3d 641
  (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

United States v. Wood, 924 F.2d 399 (1st 1991) . . . . . . . . . . . . . . . . . . . . . . . . 29

TABLE OF CITATIONS - (Cont'd)

## STATUTES AND RULES

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 41

18 U.S.C. § 3742(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 41

21 U.S.C. § 841(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

21 U.S.C. § 841(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 9, 41

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 4(b)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv, 2, 12, 40

5th Cir. R. 28.2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

## SENTENCING GUIDELINES

USSG § 1B1.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

USSG § 1B1.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

USSG § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii, 2, 13, 23

USSG § 1B1.3, comment. (n.2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SENTENCING GUIDELINES - (Cont'd)

USSG § 1B1.3, comment. (n.9(A)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

USSG § 1B1.3, comment. (n.9(B)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

USSG § 1B1.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23

USSG § 1B1.3(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

USSG § 1B1.3(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

USSG § 1B1.3(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

USSG § 1B1.3(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

USSG § 1B1.3(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

USSG § 1B1.3(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

USSG § 2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

USSG § 2D1.1, comment. (n.1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

USSG § 2D1.1(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

USSG § 2D1.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

USSG § 2D1.1(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 35

USSG § 2D1.1(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

USSG § 3B1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

USSG § 3B1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Page

SENTENCING GUIDELINES - (Cont'd)

USSG § 3B1.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATEMENT OF JURISDICTION

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment of conviction and sentence entered by the United States District Court for the Southern District of Texas, Brownsville Division. Jurisdiction also lies under 18 U.S.C. § 3742(a)(2), which provides for review of sentences that are the result of an incorrect application of the Federal Sentencing Guidelines.

The judgment appealed from was entered on the docket on June 13, 2008. Mr. Ortiz filed his pro se notice of appeal on April 1, 2009. This filing date was beyond the ten-day filing period prescribed by Fed. R. App. P. 4(b)(1)(A)(i), and also beyond the thirty-day extension period permitted by Fed. R. App. P. 4(b)(4). This Court has held, however, that the time limits prescribed for criminal appeals in Rule 4(b), although mandatory, are not jurisdictional. See United States v. Martinez, 496 F.3d 387, 388-89 (5th Cir. 2007). Thus, "there is no jurisdictional impediment to reaching the merits of this case." Id. at 389.

## STATEMENT OF THE ISSUES

<u>ISSUE ONE</u>:  Whether the district court reversibly erred when it found, under the "relevant conduct" provision of USSG § 1B1.3, that Mr. Ortiz was responsible for the cocaine found in another person's suitcase.

<u>ISSUE TWO</u>: Whether the district court committed reversible error by calculating Mr. Ortiz's base offense level under the Guidelines on the basis of the gross weight of the marijuana involved in his offense, rather than the net weight.

<u>ISSUE THREE</u>:  Whether, at a minimum, this case should be remanded for correction of the statement of reasons attached to the judgment, pursuant to Fed. R. Crim. P. 36, because the present statement of reasons incorrectly reflects that the 120-month prison sentence imposed is the mandatory minimum.

<u>STATEMENT OF THE CASE</u>

A.    <u>Proceedings Below</u>

On May 29, 2007, a federal grand jury in the Brownsville Division of the Southern District of Texas returned a six-count indictment against the defendant-appellant, Juan Antonio Ortiz, charging him with: (1) conspiracy to possess with intent to distribute more than 100 kilograms (approximately 214.64 kilograms) of marijuana, on or about May 7, 2007, in violation of 21 U.S.C. §§ 846 and 841(a)(1) & (b)(1)(B) (Count One); (2) possession with intent to distribute more than 100 kilograms (approximately 214.64 kilograms) of marijuana, on or about May 7, 2007, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. § 2 (Count Two); (3) conspiracy to possession with intent to distribute more than 100 kilograms (approximately 738.95 kilograms) of marijuana, on or about May 8, 2007, in violation of 21 U.S.C. §§ 846 and 841(a)(1) & (b)(1)(B) (Count Three); (4) possession with intent to distribute more than 100 kilograms (approximately 738.95 kilograms) of marijuana, on or about May 8, 2007, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. § 2 (Count Four); (5) conspiracy to possess with intent to distribute more than 500 grams of cocaine, on or about May 8, 2007, in violation of 21 U.S.C. §§ 846 and 841(a)(1) & (b)(1)(B) (Count Five); and (6) possession with intent to distribute more than 500 grams (approximately 550 grams) of cocaine, on or about

3

May 8, 2007, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. § 2 (Count Six). R. 18-20.[1] The indictment also charged Enedelia Cuellar and Cristal Pulido-Sotelo of the offenses alleged in Counts One through Six. R. 18-20. And, it further charged Fernando Pineda, Jr., and Juan Miguel Pineda of the offenses alleged in Counts One and Two. R. 18-19.

On September 5, 2007, Mr. Ortiz pleaded guilty to Count Two of the indictment, SR. 53; see also SR. 53-57, which alleged that he possessed with intent to distribute more than 100 kilograms (approximately 214.64 kilograms) of marijuana, on or about May 7, 2007, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. § 2. See R. 18.[2]

At sentencing, on May 12, 2008, the district court sentenced Mr. Ortiz to serve 120 months in the custody of the Bureau of Prisons, to be followed by five years of supervised release. SR. 166-67.[3] The court did not order payment of a fine, and it granted the government's motion to remit the mandatory $100 special assessment.

---

[1] The record on appeal ("R.") and the supplemental record on appeal ("SR.") are cited by the USCA5 number. The presentence investigation report ("PSR") is cited by paragraph number. The government's exhibit ("GX") and the defendant's exhibits ("DX") are cited by exhibit number.

[2] There was no plea agreement in which Mr. Ortiz waived his right to appeal.

[3] At this same sentencing, the district court revoked Mr. Ortiz's supervised release in Cause No. B-04-CR-970 and sentenced Mr. Ortiz to serve twenty-four months of imprisonment, to run consecutively to the 120-month prison sentence imposed in the instant case. SR. 166. The revocation case is not the subject matter of this appeal.

SR. 168.  The court also granted the government's motion to dismiss the remaining counts in the indictment.  SR. 169; see also R. 123.

Written judgment was entered on the docket on June 13, 2008.  See SR. 10-11 (Docket Entry No. 149); see also R. 123-27.  Mr. Ortiz filed a pro se notice of appeal on April 1, 2009.  R. 128; see also R. 11 (Docket Entry No. 151).  The late notice of appeal does not divest this Court of jurisdiction to hear Mr. Ortiz's appeal.  See United States v. Martinez, 496 F.3d 387, 388-89 (5th Cir. 2007).

B.    Statement of the Facts

1.    The Offense and Guilty Plea

Mr. Ortiz entered a guilty plea to Count Two of a six-count indictment, charging him with possession with intent to distribute more than 100 kilograms (approximately 214.64 kilograms) of marijuana, on or about May 7, 2007, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. § 2.  SR. 53.  The government proffered the following factual basis in support of Mr. Ortiz's guilty plea:

> The facts will show that on May 7th, 2007, Brownsville Immigration and Customs Enforcement agents conducted an undercover operation wherein they provided a Suburban to individuals for use as a load vehicle.  The Suburban was to be loaded with marijuana in Brownsville, Texas, and delivered to Harlingen, Texas, later that night. The operation led to the – led to the arrest of Fernando Pineda, Jr., Juan Miguel Pineda, Juan Antonio Ortiz, Enedelia Cuellar, and Cristal Pulido-Sotelo for their role in the possession of more than 100 kilograms of marijuana. The defendants knowingly and intentionally possessed the

marijuana with the intent to deliver it to another.

On said date, at approximately 9:45 p.m., the Suburban was followed by agents to a Stripes/Valero gas station on FM802 in Brownsville, Texas. The driver of the Suburban met with an individual driving a black F-150 pickup. At approximately 10:00 p.m. the Suburban left the gas station and drove to the area of the Brownsville Country Club. It then drove into the area of the Vista Verde Condominiums within the country club. At approximately 10:20 agents observed the Suburban leave the Vista Verde Condominiums and travel back to the Stripes/Valero gas station on FM802 and meet up with the same Ford F-150.

Agents then observed the driver – the driver of the F-150, Fernando Pineda, Jr., and the driver of the Suburban, Juan Miguel Pineda, switch vehicles. At approximately 10:30 p.m. both vehicles drove in tandem onto Highway 77/83 heading north towards Harlingen, Texas. At approximately 10:40 both vehicles were stopped for traffic violations north of Highway 100 on Highway 77/83. The driver of the Suburban was identified as [Fernando] Pineda, Jr. The driver –

* * *

And the driver of the F-150 was identified as Juan Miguel Pineda. A total of 214.64 kilograms of marijuana was discovered within the Suburban. Both drivers were arrested and taken to the ICE office.

Fernando Pineda, Jr., gave a statement indicating that his cousin, Juan Miguel Pineda, went to a house located in the Brownsville Country Club to load the marijuana into the Suburban. He stated he did not know exactly where the house was located. He stated Juan Miguel Pineda drove to the Valero gas station where he exchanged vehicles with him, and they proceeded to drive to Harlingen, Texas. They were going to deliver the marijuana to a person known as "Cuate."

Juan Miguel Pineda gave a statement indicating that his cousin, Fernando Pineda, Jr., had asked him to drive the Suburban to pick up the marijuana. He stated he picked up the marijuana from a garage at a

house at the Brownsville Country Club. Three females, one of which was Cristal Pulido-Sotelo, loaded the marijuana into the Suburban and – and he departed and met his cousin at the Valero gas station.

Juan Miguel Pineda drew directions on a piece of paper to the house where he had gone to load the marijuana. He indicated it was the fourth garage down from where he had turned on to the street – into the street.

Agents at the Vista Verde Condominiums identified the location as [street address omitted], Brownsville, Texas. Agents noticed a strong odor of marijuana emitting from the garage-door area of the condominium. A canine was requested to assist, and it also alerted to the odor of narcotics at the exterior of the garage door of [the condominium]. Agents knocked at the door of [the condominium]; however, no one answered, and no vehicles belonging to the address were observed.

On May 8th, 2007, agents arrested Cristal Pulido-Sotelo, Juan Ortiz, and Enedelia Cuellar at [the same condominium], Brownsville, Texas. Agents also discovered approximately 270 kilos of marijuana in plain view within the kitchen of the condominium and approximately 466 kilograms in closets within the garage of the condominium. Approximately 550 grams of cocaine were discovered within a suitcase on the bedroom floor where Ortiz and Pulido-Sotelo were discovered.

Pulido-Sotelo is the lessee of the condominium. Juan Ortiz gave a statement indicating he was aware of the marijuana within the house and that he provided – he had provided the marijuana found in the Suburban to his brother-in-law, Juan Pineda. He indicated he was storing the marijuana within the condominium for other individuals.

Enedelia Cuellar gave a statement indicating she was aware of the large bundles of marijuana within the kitchen. She indicated that she was the owner of the suitcase within – wherein the cocaine was found. She indicated that the suitcase was given to her the day before by a friend, and he was to pick it up later.

The government has no evidence to show that Fernando Pineda, Jr., or Juan Pineda were aware that any other narcotics were present in the condominium. As such their relevant conduct should be limited to 214.64 kilograms of marijuana.

SR. 53-57. Mr. Ortiz indicated that there was not "anything about that version of the testimony that [he] disagreed with" and that there was nothing he wished to add. SR. 57. However, defense counsel advised the district court that, at sentencing, he would challenge any use of the cocaine discovered in Cuellar's suitcase as relevant conduct. SR. 58-59; see also SR. 61-65.

## 2. The Presentence Investigation Report ("PSR")

Using the 2007 version of the Sentencing Guidelines Manual ("USSG"), see PSR ¶ 45, the PSR calculated Mr. Ortiz's total offense level to be 31. PSR ¶ 55. The PSR started with a base offense level of thirty-two under USSG § 2D1.1(c)(4) on the basis of Mr. Ortiz's responsibility for at least 1,000 kilograms but less than 3,000 kilograms of marijuana – specifically, 1063.59 kilograms of marijuana. PSR ¶ 46. The PSR added two levels under USSG § 3B1.1(c) because Mr. Ortiz "was an organizer, leader, manager, or supervisor in any criminal activity [other than described in § 3B1.1(a) or (b)]" by recruiting his brother-in-law Juan Miguel Pineda to help him transport marijuana. PSR ¶ 49. From the resulting adjusted offense level of thirty-four, see PSR ¶ 51, the PSR subtracted three levels pursuant to USSG § 3E1.1(a) and (b) for acceptance of responsibility. PSR ¶ 52.

A total offense level of thirty-one, with Mr. Ortiz's criminal history category of V, PSR ¶ 64,[4] resulted in an advisory Guideline imprisonment range of 168 to 210 months. PSR ¶ 87. The PSR noted that the minimum term of imprisonment for Mr. Ortiz's offense of conviction was five years and the maximum term was forty years. PSR ¶ 86 (citing 21 U.S.C. § 841(b)(1)(B)).

3. <u>Mr. Ortiz's Objections to the PSR</u>

Relevant to this appeal, Mr. Ortiz made two objections, one of which he preserved orally at the rearraignment, in writing, and orally at sentencing, and the second of which he preserved in writing and orally at sentencing. First, Mr. Ortiz argued that he should not be held accountable for the cocaine found inside Enedelia Cuellar's red suitcase because the cocaine did not belong to him. <u>See</u> SR. 58-59; Defendant's Objection[s] to the Presentence Investigation Report at 1–3; Addendum II to PSR at 1A. Second, Mr. Ortiz objected to the use of the gross weight, rather than

---

[4] Mr. Ortiz's had a total of ten criminal history points, <u>see</u> PSR ¶ 64, calculated as follows: (1) one point for the 03/13/00 conviction for possession with intent to distribute marijuana, for which he failed to appear for sentencing, PSR ¶ 58; (2) three points for the 07/28/03 sentence of three years of imprisonment upon revocation of his 01/07/02 sentence of four years of deferred adjudication for possession of marijuana, PSR ¶ 59; (3) three points for the 03/16/05 sentence of eighteen months of imprisonment for attempted illegal reentry; (4) two points because Mr. Ortiz was on supervised release for the attempted illegal reentry conviction when he committed the instant drug offense, PSR ¶ 62; and (5) one point because Mr. Ortiz committed the instant drug offense less than two years following his release from imprisonment on the attempted illegal reentry conviction. PSR ¶ 63.

Mr. Ortiz did not receive any criminal history points for a 03/17/97 conviction for criminal trespass for which he was sentenced to six months of custody suspended for six months of probation. PSR ¶ 57.

the net weight, of the marijuana and cocaine to calculate his base offense level. Defendant's Objection[s] to the Presentence Investigation Report a 1-13; SR. 77.

4.    The Sentencing

The district court overruled the relevant conduct objection. SR. 147-50. The court overruled Mr. Ortiz's objection to the PSR's use of the gross weight of the marijuana but granted it as to the cocaine. SR. 148-49; see also SR. 150.

The district court found that Mr. Ortiz's total offense level was thirty-one, his criminal history category was V, and the applicable Guideline imprisonment range was 168 to 210 months. SR. 152. The government moved for a downward departure to a sentence of 120 months of imprisonment based on Mr. Ortiz's substantial assistance. SR. 152; see also SR. 150-52. Mr. Ortiz asked for a sentence of 112 months. SR. 153. The district court granted the government's motion, permitted Mr. Ortiz to allocute in mitigation of his punishment, SR. 154, and sentenced him to serve 120 months of imprisonment, to be followed by five years of supervised release. SR. 167-68.

Other facts are presented under the arguments for which they are relevant.

## SUMMARY OF THE ARGUMENT

<u>ISSUE ONE</u>: The district court clearly erred by attributing the cocaine found in Enedelia Cuellar's red suitcase, which was discovered in the condominium bedroom in which Mr. Ortiz and his girlfriend, Cristal Pulido-Sotelo were sleeping. The cocaine offense is not similar to the marijuana offense either in purpose, source, supplier, destination, or accomplices. Cuellar acted with unknown people not shown to have been involved in the marijuana offense. Mr. Ortiz acted with the Pineda cousins in a government initiated sting operation that presented a distinctive and different course of conduct than Cuellar's cocaine offense. Cuellar was not involved in Mr. Ortiz's marijuana offense, and Mr. Ortiz was not involved in Cuellar's cocaine offense. Except for the coincidence of the timing of the offenses, there are no other similarities, either in the manner or regularity of the commission of the offenses.

On this record, the district court clearly erred in treating the cocaine offense as relevant conduct of the marijuana offense, because each offense consisted of separate and isolated events. And, the error was no harmless. Without using the cocaine offense as relevant conduct, Mr. Ortiz's total offense level would be two levels lower, which in turn would lower his Guideline imprisonment range, resulting in a prison sentence lower than the 120-month prison sentence Mr. Ortiz actually received. This Court should vacate Mr. Ortiz's sentence and remand for resentencing.

ISSUE TWO:  The district court erred in calculating Mr. Ortiz's Guideline imprisonment range because it used the gross weight of the marijuana involved in the offense, including packaging, rather than the net weight exclusive of the packaging as mandated by the Guidelines.  In light of jurisprudence indicating a "standard" ten percent reduction of the gross weight to account for packaging, and in light of the fact that the district court used the net weight of the cocaine (which had been reduced by 17.64% due to the packaging), the error was not harmless.  Without this error, Mr. Ortiz's total offense level would be two levels lower, which in turn would lower his Guideline imprisonment range, resulting in a prison sentence lower than the 120-month prison sentence Mr. Ortiz actually received. This Court should vacate Mr. Ortiz's sentence and remand for resentencing.

ISSUE THREE:   At a minimum, this Court should remand this case for the limited purpose of correcting the statement of reasons attached to the judgment, pursuant to Fed. R. Crim. 36, because the present statement of reasons incorrectly reflects that the 120-month prison sentence imposed is the mandatory minimum.

<u>ARGUMENT</u>

<u>ISSUE ONE RESTATED</u>: The district court reversibly erred when it found, under the "relevant conduct" provision of USSG § 1B1.3, that Mr. Ortiz was responsible for the cocaine found in another person's suitcase.

A.    <u>Standard of Review</u>

"The district court's findings about the quantity of drugs on which a sentence should be based are factual findings which [this Court] review[s] for clear error." <u>United States v. Mitchell</u>, 964 F.2d 454, 457 (5th Cir. 1992). "A finding will not satisfy this deferential standard '"when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."'" <u>Id.</u> at 457-58 (quoting <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573 (1985) (quoting <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948)). "[A] trial court's finding will constitute clear error where such finding either rests upon an incorrect rule of law or is inconsistent with the facts upon which it purports to rest." <u>United States v. Judon</u>, 581 F.2d 553, 554-55 (5th Cir. 1978).

B.    Pertinent Facts and District Court Findings

   1.    Mr. Ortiz's Marijuana Transaction and Cuellar's Red Suitcase

Through the use of a confidential source, agents with the United States Immigration and Customs Enforcement ("ICE") initiated a controlled marijuana transaction involving "Cuate,"[5] Fernando Pineda, Jr. ("F. Pineda), Juan Miguel Pineda ("J. Pineda"), who was F. Pineda's cousin, and defendant-appellant Juan Antonio Ortiz, who was J. Pineda's brother-in-law.  PSR ¶ 12-13.  ICE agents suspected F. Pineda, J. Pineda, and Mr. Ortiz of involvement in the smuggling of marijuana from Mexico into the United States at Brownsville, Texas, for delivery to Harlingen, Texas. PSR ¶ 13.  ICE agents set up surveillance of the Pineda cousins and Mr. Ortiz, id., and the following events transpired.[6]

F. Pineda asked his cousin J. Pineda to get him some marijuana to deliver to "Cuate" in Harlingen, Texas, in a gold Suburban provided by "Cuate."  SR. 96-97; PSR ¶¶ 17-20.  F. Pineda was to be paid $3,000, and J. Pineda was to be paid $6,000. PSR ¶¶ 18, 21.  J. Pineda then asked his brother-in-law Mr. Ortiz to get him some marijuana.  PSR ¶¶ 20, 24; SR. 98.  F. Pineda, J. Pineda, and Mr. Ortiz met several

_____

     [5] It appears that "Cuate" was ICE's confidential source, who tipped ICE agents that the Pineda cousins would be delivering marijuana to him in Harlingen, Texas.  SR. 95-96; PSR ¶ 12. ICE agents provided the load vehicle, a gold Suburban, to "Cuate," who in turn gave it to F. Pineda for transportation of the marijuana.  SR. 53-54; PSR ¶ 20.

     [6] The facts that follow are based on the PSR, see PSR ¶¶ 12-31, and the sentencing testimony of the case agent, Amador Zapata.  See SR. 84-131.

14

times between April 26, 2007, and May 7, 2007, to discuss the transportation of the marijuana from Brownsville to Harlingen. SR. 98; PSR ¶¶ 13, 20, 24.

On the evening of May 7, 2007, at approximately 9:45 p.m., F. Pineda drove the Chevrolet Suburban provided by "Cuate" to a local gas station, where he met J. Pineda, who was driving a black Ford F-150 pickup truck, and where they switched vehicles. PSR ¶¶ 14-15, 20. J. Pineda drove the Suburban to a Vista Verda condominium near the Brownsville County Club. SR. 113; PSR ¶¶ 15, 17, 20.

This condominium was rented by Mr. Ortiz's girlfriend of six months, Cristal Pulido-Sotelo. PSR ¶ 26; SR. 95, 101. At some point during their six-month relationship, Mr. Ortiz had asked Pulido-Sotelo to rent the condominium, and he provided her with the money to pay the rent. PSR ¶¶ 26-27. Mr. Ortiz ultimately used the condominium to store marijuana that he purchased from "El Licenciado" for $125 per pound in order to resell at $145 per pound. PSR ¶ 25.

The marijuana was loaded into the Suburban at this condominium. PSR ¶ 20, 25. There are two versions of how the marijuana was loaded. According to Mr. Ortiz, J. Pineda and Mr. Ortiz loaded the marijuana. PSR ¶ 24. According to J. Pineda, three females, one of whom was Pulido-Sotelo, loaded the marijuana. PSR ¶ 20; SR. 113-14. Also, according to J. Pineda, Mr. Ortiz was not at the condominium when the marijuana was loaded. PSR ¶ 20.

After the marijuana was loaded, J. Pineda drove back to the gas station and switched vehicles with F. Pineda. PSR ¶ 15. J. Pineda then followed F. Pineda on his way to Harlingen, Texas, to deliver the marijuana. PSR ¶ 15. Shortly after the Pineda cousins left the gas station, Cameron County deputies stopped them for traffic violations. PSR ¶ 15. Deputies found 214.64 kilograms of marijuana in the Suburban, and they found a ledger in the Ford F-150 with $87,000 (the value of the marijuana) written in it. PSR ¶ 16.

After getting statements from the Pineda cousins and directions from J. Pineda to the condominium where the marijuana had been loaded, ICE agents went to the condominium, smelled a strong odor of marijuana emanating from the garage, and attempted to get consent to search. PSR ¶ 22. But, no one was at the condominium at the time. PSR ¶ 22; SR. 119.

On the morning of the next day, May 8, 2007, ICE agents returned to the condominium where they "knocked and announced." SR. 108; PSR ¶ 23. But, after agents saw a female approach the sliding glass door and then rush back into the condominium, they entered and secured the condominium. SR. 108. They arrested Pulido-Sotelo, Mr. Ortiz, and Enedelia Cuellar. PSR ¶ 23. Also inside the condominium was Pulido-Sotelo's minor child. PSR ¶ 23. Agents discovered marijuana in the kitchen and garage totaling 738.95 kilograms. PSR ¶ 23. They also

discovered 550 grams of cocaine underneath female clothing in a red suitcase in the bedroom where Pulido-Sotelo and Mr. Ortiz had spent the previous night. PSR ¶ 23. There was no cocaine in any other part of the condominium. SR. 94.

According to Cuellar, the red suitcase belonged to her, but she did not know that there was cocaine in her suitcase. SR. 90-91; PSR ¶ 28. In fact, Mr. Ortiz, Pulido-Sotelo, and Cuellar denied knowledge of the cocaine. SR. 94. Agent Zapata testified at sentencing that, other than the fact that Mr. Ortiz actually rented the condominium, he did not have any evidence tying Mr. Ortiz to the cocaine. SR. 95. The reasons Agent Zapata attributed the cocaine to Cuellar were: (1) the cocaine was found in Cuellar's red suitcase, and (2) during her third debriefing, Pulido-Sotelo claimed that Cuellar actually imported cocaine into the United States. SR. 109-10. Agent Zapata also testified, however, that he did not have any prior intelligence about Cuellar importing cocaine, SR. 111, and that it was difficult to weed out the truth because everyone lied a little bit during their debriefings. SR. 110. He opined that, typically, a drug importer would deliver the drugs immediately and not hold on to them for two or three days, but he also admitted that it was still possible that Cuellar imported the cocaine. SR. 111.

The evidence reflects that Pulido-Sotelo and Cuellar were friends, and that Cuellar, who lived in Matamoros, Mexico, often stayed with Pulido-Sotelo on the

weekends to go to bars and nightclubs and slept with Pulido-Sotelo in the bedroom in which the red suitcase was found. PSR ¶¶ 27-29; SR. 92-93. According to Cuellar, on May 6, 2007, she spent the night with a male friend in Brownsville. PSR ¶ 28. The next day, May 7, 2007, she went back to Matamoros, Mexico, to get money from her mother. PSR ¶ 28. She then returned legally to the United States, after which her male friend contacted her to ask her if she was going to retrieve the red suitcase. PSR ¶ 28; SR. 91. Cuellar told her friend to meet her at the port of entry, where he thereafter gave her the suitcase. PSR ¶ 28; SR. 91-92.[7] Her friend "Shelley" picked her up. PSR ¶ 28.

Cuellar explained that she arrived at Pulido-Sotelo's condominium on the evening of May 7, 2007, where she did not see anything out of the ordinary. PSR ¶ 29. She went out that evening, returning to the condominium around 2:00 a.m. on May 8, 2007. PSR ¶ 29. At that time, Cuellar noticed large bundles of marijuana in the kitchen. PSR ¶ 30. According to Cuellar, Mr. Ortiz was at the condominium and was upset that she had gotten home so late. PSR ¶ 29. Cuellar noticed that Mr. Ortiz and Pulido-Sotelo were sleeping together in the bedroom that she usually shared with Pulido-Sotelo and Pulido-Sotelo's minor daughter. PSR ¶ 29. She and Pulido-Sotelo's daughter, therefore, slept in the second bedroom. PSR ¶ 29; SR. 92-93.

---

[7] Cuellar varied her story a little bit over time. See SR. 91-92. At one point, she indicated that she me her friend at the border, and he gave her the suitcase to keep. See SR. 91.

Cuellar left her suitcase in the bedroom shared by Mr. Ortiz and Pulido-Sotelo. SR. 89-90; see also DX-4 (diagram of house).

According to Cuellar, when deputies arrived at the condominium on the morning of May 8, 2007, Mr. Ortiz stated that "they are coming for me." PSR ¶ 31.[8] Also, according to Cuellar, Mr. Ortiz "is the one who knows everything." PSR ¶ 31.

2. <u>Dispositions and the District Court's Findings</u>

F. Pineda and J. Pineda pleaded guilty to Count Two of the indictment, the same Count to which Mr. Ortiz and Pulido-Sotelo also pleaded guilty, charging their possession with intent to distribute the 214.64 kilograms of marijuana found in the Suburban. PSR ¶¶ 8-9. At the Pinedas' rearraignments, the district court found that their relevant conduct was limited to the 214.64 kilograms of marijuana found in the Suburban. PSR ¶ 8; see also PSR ¶¶ 32-33. According to Mr. Ortiz's PSR, F. Pineda was an organizer/supervisor of this marijuana transaction because he recruited J. Pineda to help him transport the marijuana to "Cuate" and he discussed the mechanics of the transportation with "Cuate" and Mr. Ortiz. PSR ¶ 32. The PSR labeled J. Pineda as an average participant. PSR ¶ 33.

---

[8] Agent Zapata testified that, even though Pulido-Sotelo's and Cuellar's statements during their debriefings varied and changed, it appeared that Pulido-Sotelo and Cuellar picked Mr. Ortiz up the night of May 7, 2007, or May 8, 2007, from a bar or a friend's house; that Mr. Ortiz was upset; and that Mr. Ortiz stated that his brother-in-law was not answering his calls, he thought that his brother-in-law had been arrested, and that "It's over. It's done, I'm screwed. I'm screwed." SR. 109. But, at one point, they even stated that they did not pick up Mr. Ortiz. Id.

According to Mr. Ortiz's PSR, Pulido-Sotelo and Cuellar were average participants. PSR ¶¶ 36, 38. Pulido-Sotelo suspected Mr. Ortiz of storing narcotics in the garage of the condominium, but chose not to report the illegal activity to the authorities. PSR ¶ 36. And, Cuellar, who pleaded guilty to a criminal information charging her with misprision of a felony, knew that narcotics were stored in the condominium, but also chose not to report the illegal activity to authorities. PSR ¶ 38.

The district court found that Mr. Ortiz was an organizer/leader because, through the use of his twenty-one-year-old girlfriend Pulido-Sotelo, he secured and paid for the stash house, he provided the marijuana, and made arrangements for the transportation of the marijuana. SR. 145-47, 149-50. PSR ¶¶ 34, 49. Moreover, the court found that he was responsible for the cocaine found in Cuellar's red suitcase. SR. 148-50. The district court opined that the story of the red suitcase "sounded very, very strange," SR. 147, and it was "a very big stretch for [the court] to believe that [Cuellar] was not, you know, doing this [transporting cocaine] at the instruction of – of Ortiz." SR. 148. According to the district court, it was also "just as plausible . . . that th[e] cocaine was in that household and that the defendant Ortiz, being more experienced,[9] knew that by placing that cocaine in that suitcase that he could back

<hr>

[9] The district court noted that, according to the PSR, Mr. Ortiz started smoking marijuana at the age of seventeen, and even smoked it two days prior to his instant arrest. SR. 144; PSR ¶ 76. He also started using cocaine in 2006, spending $100 for cocaine every two weeks and last using it on the date of his instant arrest. R. 144; PSR ¶ 76. The district court further observed that Mr. Ortiz had two prior marijuana convictions, one of which involved another woman and fifteen

away from it and have – and leave the defendant Cuellar holding the bag for all practical purposes." SR. 148.

It appears, however, that the district court based these opinions on a misapprehension of the facts. Specifically, the court believed that Cuellar retrieved her red suitcase from her male friend on the evening of May 7, 2007, or early morning of May 8, 2007, after she had been out nightclubbing, which is contrary to the case agent's testimony at sentencing, see SR. 90-93, and the PSR, see PSR ¶¶ 27-29:

> Now, as far as the – the cocaine – at the time that the first young lady pled, that being the – I think it was Pulido-Sotelo who first pled, and then they – the other woman wound up getting – pleading guilty to a mispris[i]on of a felony. That story about the suitcase, it sounded very, very strange to me that – that this young girl was – had been nightclubbing that night and somehow or another somebody called her to ask her if she was going to pick up her red suitcase and that she picked up that red suitcase and then she went to this friend's house after having been nightclubbing that night, and – and then for her to have this quantity of cocaine just kind of out there waiting to be claimed by her, when I – I saw the presentence report and I saw the – the – how the codefendants were explaining how it happened, that she was sleeping in the room with Pulido-Sotelo or Sotelo Pulido – I can't remember how – Pulido-Sotelo?

R. 147.

The district court appeared to agree with the sentencing testimony and the PSR as to the explanation of how Cuellar ended up sleeping in the second bedroom.

---

bundles of marijuana found in a rear passenger door panel. R. 146; see also PSR ¶¶ 58-59 (describing respectively, a 2000 Oklahoma marijuana possession conviction and a 2002 Texas marijuana possession conviction).

When the defendant Ortiz came in, I mean, he is the – the man of the house. He kicked her out. This is his house. This is his stash house.

So, you know, she gets to go to the –the second bedroom, and when the officers showed up that morning having already been – having had their attention brought to that residence . . . , when they located – or they – with that map provided by Juan [Pineda] they found the location where the – the marijuana had been obtained from . . . .

SR. 147-48.

Based on this, the district court found by a preponderance of the evidence that the cocaine found in the red suitcase should be attributable to Mr. Ortiz as relevant conduct. SR. 148. In total, Mr. Ortiz was held accountable for the 214.64 kilograms of marijuana found in the Suburban, the 738.95 kilograms of marijuana found in the condominium, and the 550 grams of cocaine found in the red suitcase. SR. 148-50; PSR ¶¶ 34, 46.

C.     The Cocaine Offense Was an Unrelated and Isolated Event That Was Not Similar to, and Thus Not Relevant Conduct of, the Marijuana Offense.

For purposes of calculating Mr. Ortiz's base offense level, the district court found that the cocaine in Cuellar's red suitcase in the bedroom in which Mr. Ortiz stayed overnight with Pulido-Sotelo was relevant conduct to Mr. Ortiz's offense of conviction of possession with intent to distribute marijuana. SR. 147-50. Reviewing the evidence in light of the Guideline pertaining to relevant conduct and this Court's precedent demonstrates that the district court's finding that the cocaine seizure was

relevant conduct of the marijuana offense is clearly erroneous.

Section 1B1.3(a) of the Sentencing Guidelines sets out what "relevant conduct" the district court may consider in calculating a defendant's base offense level. See USSG § 1B1.3(a)(1)-(4). For offenses involving controlled substances, a defendant is accountable of "all acts and omissions described in subdivisions (1)(A) and (1)(B) [of USSG § 1B1.3] that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2).

Subdivision (1)(A) instructs that a defendant is accountable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." USSG § 1B1.3(a)(1)(A). Therefore, for offenses involving a controlled substance, such as the instant offense of conviction, a defendant is accountable for all quantities of a controlled substance "with which he was directly involved." USSG § 1B1.3, comment. (n.2.).

In the case of a "jointly undertaken criminal activity," however, subdivision (1)(B) instructs that a defendant is accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B). In other words, a defendant "is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal

activity." USSG § 1B1.3, comment. (n.2). "A 'jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." Id.; see also USSG § 1B1.3(a)(1)(B).

Based on the facts, as set forth in the previous section, the acts "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused" were the following: (1) Mr. Ortiz bought marijuana from "El Licenciado" for $125 per pound to resell for $145 per pound; (2) Mr. Ortiz stored this marijuana in a condominium that he asked his girlfriend Pulido-Sotelo to rent and for which he actually paid the rent; (3) Mr. Ortiz agreed to help the Pineda cousins furnish "Cuate" with 214.64 kilograms of marijuana; (4) Mr. Ortiz and the Pineda cousins met several times to discuss this marijuana transaction; (5) Mr. Ortiz told J. Pineda to pick up the marijuana from the condominium rented in Pulido-Sotelo's name; and (6) either Mr. Ortiz and J. Pineda loaded the marijuana into the Suburban provided for the marijuana transaction, or Pulido-Sotelo and two other unknown females loaded the marijuana into the Suburban upon Mr. Ortiz's directions. See supra text, at 14-17.

These same acts show that Mr. Ortiz not only possessed with intent to distribute the 214.64 grams of marijuana seized from the Suburban but also the 738.95 kilograms of marijuana seized from the kitchen and garage of the condominium.

Some of these acts were also a part of a "jointly undertaken criminal activity" with the Pineda cousins to distribute marijuana to "Cuate." Although some of these acts may have been a part of a "jointly undertaken criminal activity with "El Licenciado," any criminal activity in this regard, other than the acquisition of marijuana from "El Licendiado," was not developed in the PSR or during the sentencing hearing in this case. Thus, under § 1B1.1(a)(1) and (2), Mr. Ortiz clearly was accountable for the marijuana seized from the Suburban (214.64 kilograms), which formed the basis of his conviction, and also for the marijuana seized from the condominium (738.95 kilograms).

However, clearly none of the above-described acts for which Mr. Ortiz either was directly responsible or for which he jointly undertook involved cocaine. Compare supra text, at 14-17, with id. at 17-19. The only place the cocaine was found in the condominium was in Cuellar's red suitcase in the bedroom that she usually shared with Pulido-Sotelo on her weekend visits. Agent Zapata testified at sentencing that cocaine was not found anywhere else in the condominium. And, although the record reflects that Mr. Ortiz used cocaine and did so most recently on the date of his arrest, there is no evidence in the record that demonstrates, more likely than not, that Mr. Ortiz used that cocaine (given that there were no fingerprints on the cocaine), that he knew that there was cocaine in Cuellar's suitcase, or that he had asked Cuellar to bring

him the cocaine. Moreover, as the district court itself noted, Cuellar admitted to using cocaine at least once, and Pulido-Sotelo admitted to using cocaine four times. SR. 144. Furthermore, during one of her debriefings, Pulido-Sotelo claimed that Cuellar actually imported cocaine into the United States on a regular basis in the manner that she said she did it this time. In fact, there is nothing in the record to indicate that Mr. Ortiz had ever been involved in, or suspected of being involved in, the smuggling or distribution of cocaine. And, Mr. Ortiz's past drug convictions involved marijuana – not cocaine. See PSR ¶¶ 58-59.

Cuellar specifically told the agents that the red suitcase belonged to her, and she explained how that red suitcase ended up in Pulido-Sotelo's bedroom. Although the district court thought that Cuellar's story "sounded very, very strange," SR. 147, this assessment was based on a misapprehension of the facts. The court mistakenly thought Cuellar had retrieved the red suitcase from her male friend after having gone nightclubbing late into the evening of May 7, 2007, and into the early morning of May 8, 2007. However, Cuellar told agents that she retrieved the suitcase at the border earlier in the day, thereafter went to the condominium, and then later went nightclubbing, returning to the condominium at 2:00 a.m. on May 8, 2007, to find Pulido-Sotelo and Mr. Ortiz sleeping in the bedroom where she had left her suitcase. Significantly, the government did not present any evidence that Cuellar's version of

what happened was false or coerced by anyone.

On this record, it was pure speculation for the district court to find either (1) that Cuellar brought the cocaine to the condominium at the behest of Mr. Ortiz; or (2) that the cocaine was in the condominium from the beginning and Mr. Ortiz simply hid it the suitcase so that the agents would lay blame on Cuellar rather than Mr. Ortiz.[10] See SR. 148. This Court has instructed that "the district court cannot make sentencing determinations based on pure speculation . . . ." United States v. Paul, 274 F.3d 155, 164 (5th Cir. 2001). Indeed, this Court has reversed where drug quantities have been based on such pure speculation. See United States v. Leal, 74 F.3d 600, 608 (5th Cir. 1996) (holding that district court reversibly erred in attributing drug quantity to defendants where attribution was based upon "suppositions" and "intuition alone" and thus "[was] not supported by a preponderance of the evidence").

The evidence is not sufficient to show that the cocaine offense was a "part of the same course of conduct or common scheme or plan as the [marijuana] offense of conviction." USSG § 1B1.3(a)(2). The government did not prove that the events surrounding the cocaine offense were "substantially connected to [the events surrounding the marijuana offense] by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." USSG

_____

[10] The lack of any fingerprints on the cocaine undercuts this speculative opinion.

§ 1B1.3, comment. (n.9(A)); <u>United States v. Wall</u>, 180 F.3d 641, 645 (5th Cir. 1999) (observing that some courts have found that a "common scheme or plan" requires that the acts be connected together by common participants or by an overall scheme). Moreover, the government did not prove that the events surrounding the cocaine offense were "sufficiently connected or related to [the events surrounding the marijuana offense] to warrant a conclusion that they [were] part of a single episode, spree, or ongoing series of offenses." USSG § 1B1.3, comment. (n.9(B)); <u>see</u> <u>Wall</u>, 180 F.3d at 645 (observing that, in order to find "the same course of conduct," some courts look to whether the defendant repeated the same type of criminal activity over time).

More specifically, on this record, Cuellar appears to have had nothing to do with the marijuana offense. And, except that Cuellar was a friend of Mr. Ortiz's girlfriend, Pulido-Sotelo, and stayed at the condominium the same night that Mr. Ortiz stayed there, the facts do not reflect any "degree of similarity of the offenses [or] regularity (or repetitions) of the offenses." <u>Wall</u>, 180 F.3d at 645. Although the cocaine offense occurred during the same general time frame as the marijuana offense, this nominal similarity in the offenses does not overcome the absence of any similarity of purpose, source, supplier, destination, or accomplices, or the absence of a strong showing of regularity. <u>See</u> <u>id.</u> at 645-46 (explaining that when one of the factors is

absent, at least one of the other factors should have a stronger presence). Where there is this kind of a lack of similarity between the drug offenses, this Court has found that the district court clearly erred by finding one drug offense was relevant conduct of another drug offense. Cf., e.g, id. at 645-47 (vacating sentence because 1996 and 1997 marijuana offenses were neither part of the same common scheme or plan as the 1992 marijuana offense nor part of the same course of conduct as the 1992 offense because they did not share common accomplices or a distinctive modus operandi, and they were separated by a number of years); cf. also, e.g., United States v. Booker, 334 F.3d 406, 414-15 (5th Cir. 2003) (vacating sentence because the crack conspiracy and the marijuana seizure did not share a common source, supplier, or destinations; nor was there a strong showing of regularity).

Other circuits have also vacated sentences where there is an absence of these kinds of similarities or repetitions of the offenses. Cf., e.g. United States v. Wood, 924 F.2d 399, 404-05 (1st Cir. 1991) (vacating sentence because fourth drug transaction, unlike previous three drug transactions, was committed solely by defendant's wife, and, although defendant benefitted from her criminal activity – distinctly different conduct – defendant did not know of his wife's involvement until after the completion of her offense); United States v. Montoya, 952 F.2d 226, 228-29 (8th Cir. 1991) (vacating sentence because only link between Florida marijuana

negotiations and Omaha cocaine conspiracy was vague, and the only common element between the two events was the presence of the defendant).

For the reasons stated above, this Court should find that the district court clearly erred by finding that the cocaine offense was relevant conduct of the marijuana offense for purposes of determining the base offense level. Without the 100 kilograms of cocaine (converted to its marijuana equivalency), the total weight of the drugs would have been 738.95 kilograms of marijuana, which would have resulted in a total offense level of thirty, rather that the total offense level of thirty-two that was used in this case. The new total offense level of twenty-nine (based on a base offense level of thirty, a two-level increase for organizer/manager, and a three-level reduction for acceptance of responsibility), with a criminal history category of V, would have resulted in a Guideline imprisonment range of 140 to 175 months.

With the equivalent one-third reduction off the bottom and top of the Guideline imprisonment range that the district court awarded Mr. Ortiz for his substantial assistance, Mr. Ortiz's new Guideline imprisonment range would have been 93 to 117 months – anywhere from three to twenty-seven months less than the 120-month prison sentence actually imposed. There is nothing in this record that demonstrates that, absent the Guideline calculation error, the district court would have imposed the same 120-month prison sentence. See United States v. Neal, 578 F.3d 270, 274 (5th Cir.

2009) (vacating sentence because nothing in the record indicated that "the district court would have imposed the same sentence regardless of the Guidelines range"); United States v. Delgado-Martinez, 564 F.3d 750, 753-54 (5th Cir. 2009) (vacating sentence because the record did not convince the Court that "the district court would have imposed the same sentence absent the Guidelines error"). In fact, as the discussion under Issue Three reveals, the district court may well have incorrectly believed that the 120-month prison sentence was the mandatory minimum sentence that it could have imposed. See infra text, at 40-41 (asking this Court to correct the erroneous notation in the statement of reasons to the judgment that the sentence imposed is the mandatory minimum).

Accordingly, this Court should vacate Mr. Ortiz's sentence and remanding for resentencing.

<u>ISSUE TWO RESTATED</u>: The district court committed reversible error by calculating Mr. Ortiz's base offense level under the Guidelines on the basis of the gross weight of the marijuana involved in his offense, rather than the net weight.

A.    <u>Standard of Review</u>

This Court "review[s] the district court's application of the sentencing guidelines <u>de novo</u>." <u>United States v. Arviso-Mata</u>, 442 F.3d 382, 384 (5th Cir. 2006) (footnote with citations omitted).

B.    <u>Relevant Facts</u>

Mr. Ortiz objected in the district court that the total amount of drugs attributed to him was the gross weight and argued that the net weight should be used. SR. 77; <u>see also</u> Defendant's Objection[s] to the Presentence Investigation Report at 1-3. At sentencing, the case agent, Amador Zapata, confirmed that the PSR calculated the base offense level using the gross weight, rather than the net weight, of the seized drugs. SR. 102-03; <u>see also</u> SR. 80 (prosecutor acknowledging that gross weight was used). Agent Zapata testified that, in his limited experience, the net weight of marijuana was calculated by reducing the gross weight by 5% to account for the packaging.[11] SR. 111-12. He admitted, however, that he could not remember if the

---

[11] Reducing the marijuana by 5% to account for the packaging would cause the gross weight of the marijuana to drop as follows: (1) gross weight of 214.64 kilograms of marijuana found in the Suburban reduced by five percent results in a net weight of 203.91 kilograms; and (2) gross weight

net weight of drugs had ever been calculated by reducing the gross weight by 10% percent, the percentage reduction sought by Mr. Ortiz.  SR. 120, 122.

The DEA-7 lab report, see DX-5, reflects that the packaging in this case probably accounted for more than 5% of the gross weight of the marijuana and that it definitely did in the case of the cocaine.  The DEA-7 lab report chronicles the gross weights and net weights for two samples taken from the marijuana that was seized and for the total amount of the cocaine that was seized.[12]  See SR.105; DX-5.  For one marijuana sample, Exhibit A-J with Lab No. C20804, the gross weight was 68.4 grams and the net weight was 38.2 grams; this is a difference of 30.2 grams, which means that the packaging accounted for 44.15% of the gross weight.  See DX-5.  For the second marijuana sample, Exhibit A-J with Lab No. C20805, the gross weight was 53.6 grams and the net weight was 24.5 grams; this is a difference of 29.1 grams, which means that the packaging accounted for 54.29% of the gross weight.  See DX-5. And, for the cocaine that was seized, the gross weight was 607.8 grams, and the net weight was 500.6 grams; this is a difference of 107.2 grams, which means that the weight of the packaging accounted for 17.64% of the gross weight.  See DX-5; see also SR. 121.

of 738.95 kilograms of marijuana found in the house reduced to a net weight of 702.00 kilograms. The net weight total of the marijuana, with the 5% reduction, becomes 905.91 kilograms.

[12] As of the date of sentencing, the bulk marijuana had been destroyed.  See SR. 105-06.

The probation officer, Enrique Guerra, testified at sentencing that, if he had seen the DEA-7 lab report, he would have changed the gross weight of the cocaine used in the PSR to the net weight of 500.6 reflected in the DEA-7 lab report. SR. 126. Guerra did not indicate what he would have done about the gross weight of the marijuana used in the PSR based on the differences between the gross weights and net weights of the marijuana reflected in the DEA-7 lab report. And, the district court did not let Mr. Ortiz ask Guerra what, in his experience, would be the percentage of reduction for the amount of marijuana in this case. See SR. 129. The court thought Guerra's response would be too speculative, because Guerra was neither a chemist nor an expert. See id.

The district court ultimately used the gross weight of the marijuana (738.95 kilograms) and the net weight of the cocaine (500.6 grams) to calculate the base offense level, without any explanation for using the gross weight of one and the net weight of the other. SR. 150. The court found that the total weight of the marijuana and cocaine (converted to its marijuana equivalency of 100 kilograms) was 1,053.59 kilograms.[13] SR. 128-29, 150. These new calculations did not change Mr. Ortiz's

---

[13] The total of 1053.59 kilograms was calculated as follows: (1) 738.95 kilograms (gross weight) of marijuana found in the house + 214.64 kilograms (gross weight) of marijuana found in the Suburban = 953.59 kilograms of marijuana, + (2) 100 kilograms of cocaine (500.6 grams converted to its marijuana equivalency). See USSG § 2D1.1, n.10(E) (1 gram of cocaine = 200 grams of marijuana).

base offense level of thirty two.

C.   The District Court Committed Reversible Error by Calculating Mr. Ortiz's
     Guidelines on the Basis of the Gross Weight of the Marijuana Involved in His
     Offense, Rather Than the Net Weight.

For drug offenses, the Guideline offense level is determined primarily on the

basis of the drug quantity involved.  See USSG§ 2D1.1(a)(3) and (c) (Drug Quantity

Table).  A quantity of "[a]t least 1,000 KG but less than 3,000 KG of Marijuana"

garners a base offense level of thirty-two.  USSG § 2D1.1(c)(4).  A drug quantity of

"[a]t least 700 KG but less than 1,000 KG of Marihuana," however, receives a base

offense level of only thirty.  USSG § 2D1.1(c)(5).

"Unless otherwise specified, the weight of a controlled substance set forth in

the table refers to the entire weight of any mixture or substance containing a

detectable amount of the controlled substance."  USSG § 2D1.1(c), n.(A).  "[The

phrase] ['m]ixture or substance['] does not include materials that must be separated

from the controlled substance before the controlled substance can be used."  USSG

§ 2D1.1, comment. (n.1).  This means that, "[u]nder the [S]entencing [G]uidelines, the

offense is calculated with reference to the *net* weight of the narcotics involved, i.e.,

*net of the packaging*."  Chukwurah v. United States, 813 F. Supp. 161, 166 (E.D.N.Y.

1993) (emphasis added; citation omitted).  It is thus reversible error to calculate a

defendant's base offense level under USSG § 2D1.1 by using the *gross* weight of the

substances, including the packaging. See, e.g., United States v. Luster, 896 F.2d 1122, 1130 (8th Cir. 1990) (vacating sentence and remanding for resentencing where district court erroneously used gross weight of narcotics, including packaging, to calculate Guidelines).

The district court committed this error here because the 738.95 kilogram figure used by the district court for the marijuana was the gross weight of the marijuana and its packaging. Moreover, the error of using the gross weight is not harmless. The government never calculated the actual net weight of the bulk marijuana, see SR. 103, as it did for the cocaine, See DX-5, and it could not have done so at the time of sentencing because the marijuana had been destroyed. Moreover, based on the DEA-7 lab report, it appears that a significant percentage of the weight of the marijuana would have been attributed to the packaging. See DX-5 (reflecting that differences in gross weights and net weights of marijuana samples were 44.15% for one sample and 54.29% for the other sample). The district court credited the DEA-7 lab report as an accurate indication of the weight of the packaging for the cocaine, and used that net weight, which represented a 17.64% reduction for packaging. Despite this, the district court did not try to determine, let alone estimate, the net weight of the marijuana.

In light of the 17.64% reduction for the packaging of the cocaine, it was not

unreasonable for Mr. Ortiz to ask the district court to reduce the gross weight of the marijuana by 10% to account for its packaging. Using the 10% reduction for packaging, the net weight of the marijuana would have been 858.23 kilograms, well under the 1000 kilograms (10% of 953.59), even with the addition of the 100 kilograms of cocaine (converted to its marijuana equivalency). This would have resulted in a base offense level of thirty, rather than the base offense level of thirty-two that was used in sentencing Mr. Ortiz.

It is significant that, in another marijuana trafficking case, another experienced judge of the United States District Court for the Southern District of Texas – the very jurisdiction where this case arises – noted that "[t]he typical reduction for packaging is ten percent of the gross weight . . . ," United States v. Bobbitt, Cr. No. C-06-282 & C.A. No. C-07-393, 2008 WL 822025, at *5 (S.D. Tex. Mar. 26, 2008) – the reduction Mr. Ortiz suggested was applicable in this case. Such a reduction for packaging also is consistent with the practice in other jurisdictions. See, e.g., United States v. Angeles-Amaya, 9 Fed. Appx. 640, 641 (9th Cir. 2001) (unpublished) (noting that, in a marijuana case, "[t]he probation officer [ ] accounted for the weight of the packaging material by making a standard ten percent reduction . . . .").

In one jurisdiction that typically used a 5% reduction for packaging, the district court used an 8% reduction to give the defendant the benefit of the doubt due to

differences in the packaging. See United States v. Clonts, 966 F.2d 1366, 1371 (10th Cir. 1992). Even using an 8% reduction in this case – which would give Mr. Ortiz the benefit of the doubt, given the substantial differences in the gross and net weights of the marijuana samples, the 17.64% reduction for the cocaine credited by the district court, and the government's failure to calculate the net weight of the marijuana – the net weight of the marijuana would be 877.30 kilograms (8% of 953.59), also under 1000 kilograms, even with the addition of the 100 kilograms for the cocaine (converted to its marijuana equivalency). This too would result in a base offense level of thirty, rather than the base offense level of thirty-two that was used in sentencing Mr. Ortiz.

The new total offense level of twenty-nine (based on a base offense level of thirty, a two-level increase for organizer/manager, and a three-level reduction for acceptance of responsibility), with a criminal history category of V, would have resulted in a Guideline imprisonment range of 140 to 175 months. With the equivalent one-third reduction off the bottom and top of the Guideline imprisonment range that the district court awarded Mr. Ortiz for his substantial assistance, Mr. Ortiz's new Guideline imprisonment range would have been 93 to 117 months – anywhere from three to twenty-seven months less than the 120-month prison sentence actually imposed. There is nothing in this record that demonstrates that, absent the

Guideline calculation error, the district court would have imposed the same 120-month prison sentence.  See United States v. Neal, 578 F.3d 270, 274 (5th Cir. 2009) (vacating sentence because nothing in the record indicated that "the district court would have imposed the same sentence regardless of the Guidelines range"); United States v. Delgado-Martinez, 564 F.3d 750, 753-54 (5th Cir. 2009) (vacating sentence because the record did not convince the Court that "the district court would have imposed the same sentence absent the Guidelines error"). In fact, as the discussion under Issue Three reveals, the district court may well have incorrectly believed that the 120-month prison sentence was the mandatory minimum sentence that it could have imposed.  See infra text, at 40-41 (asking this Court to correct the erroneous notation in the statement of reasons to the judgment that the sentence imposed is the mandatory minimum).

Accordingly, this Court should vacate Mr. Ortiz's sentence and remanding for resentencing.

ISSUE THREE RESTATED:  At a minimum, this case should be remanded for correction of the statement of reasons attached to the judgment, pursuant to Fed. R. Crim. P. 36, because the present statement of reasons incorrectly reflects that the 120-month prison sentence imposed is the mandatory minimum.

A.     Standard of Review

Although this error was not raised in the district court, "[a]fter giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission."  Fed. R. Crim. P. 36.  This Court may review clerical errors in the judgment for the first time on appeal and remand a case to the district court with instructions to correct the errors in the judgment.  See, e.g., United States v. Johnson, 588 F.2d 961, 964 (5th Cir. 1979) (noticing clerical errors and remanding for correction of judgment); United States v. Sapp, 439 F.2d 817, 821 (5th Cir. 1971) (reviewing clerical errors and remanding for correction of judgment).

B.     At a Minimum, This Case Should Be Remanded for Correction of the Statement of Reasons Attached to the Judgment Under Fed. R. Crim. P. 36, as the Present Statement of Reasons Incorrectly Reflects that the 120-Month Prison Sentence Imposed Is the Mandatory Minimum Sentence.

At a minimum, this Court should remand this case for the limited purpose of correcting the statement of reasons attached to the judgment, pursuant to Fed. R. Crim. 36, because the present statement of reasons incorrectly reflects that the 120-month

prison sentence imposed is the mandatory minimum.  <u>See</u> Statement of Reasons at 1 (located at Docket Entry No. 150).  Mr. Ortiz was charged with and pleaded guilty to possession with intent to distribute more than 100 kilograms (approximately 214.64 kilograms) of marijuana, in violation 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. § 2.  <u>See</u> 18-20; SR. 53-57.  The statutory punishment range for this offense is not less than five years and not more than forty years.  21 U.S.C. § 841(b)(1)(B).  Thus, the statutory mandatory minimum sentence under § 841(b)(1)(B) is five years (or sixty months).  Therefore, Mr. Ortiz's 120-month prison term clearly is not the mandatory minimum.

Because the statement of reasons to Mr. Ortiz's judgment incorrectly reflects that his 120-month prison sentence is the mandatory minimum, this Court should, at a minimum, remand this case to the district court for the limited purpose of correcting the statement of reasons judgment to remove the check in the box indicating that the sentence is the mandatory minimum.  <u>Cf. e.g.</u>, <u>United States v. Lopez-Alvarez</u>, 253 Fed. Appx. 404, 405 (5th Cir. 2007) (unpublished) (remanding for correction of error in the written judgment regarding the offense of conviction).

## CONCLUSION

For the foregoing reasons, this Court should vacate Mr. Ortiz's sentence and remand for resentencing. In the alternative, this Court at least should remand this case to the district court for the limited purpose of correcting the statement of reasons attached to the judgment so that it does not incorrectly reflect that the sentence imposed is the mandatory minimum.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender

_____
LAURA FLETCHER LEAVITT
Assistant Federal Public Defender
Southern District of Texas
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1634
Telephone: (713) 718-4600

CERTIFICATE OF SERVICE

I, Laura Fletcher Leavitt, certify that today, November 6, 2009, a hard copy of the brief for appellant, a computer readable 3.5-inch disk containing a copy of the brief for appellant, and a copy of the record excerpts were served upon Mr. James L. Turner, Assistant United States Attorney, Southern District of Texas, by Federal Express No. 8706 7382 8428, c/o United States Marshal, 515 Rusk Avenue, Houston, Texas 77002. The appellate record is available on CD-ROM.

_____

LAURA FLETCHER LEAVITT

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 10,281 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Corel WordPerfect 13.0 software in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.    Electronic copies of this brief and the record excerpts are on separate 3.5-inch diskette complying with 5TH CIR. R. 31.1 and 31.1.2 because the brief and the record excerpts have been converted into Portable Document File (PDF) format.


_____
LAURA FLETCHER LEAVITT